Good afternoon, Your Honor. This is the case of In-Ray Text Messaging Antitrust Matters and it's appeal number 14-2301. Thank you, Your Honor. May it please the Court, Patrick Coughlin on behalf of the certified class of pay-per-use texters. I'd like to address three issues first. Pricing, the protection for bundle explanation, as well as the herdage roddy email, and then of course answer any questions that the Court may have. Prior to 2005, pricing was diverse and complex in this area as far as PPU text and entry-level bundle text. It was all over the board from two cents to ten cents to to receive and from five cents to ten cents to send. So it was complex. You also had bundles from $1.99 going up to $2.99 up to $4.99 and $5. That's a situation that we had when text was exploding because after 2002 it was interoperable between the carriers. So text was doubling or the number of messages being sent was doubling during this time period and you had a diverse situation. In 2005 that all changed. First in August in 2005 Verizon went to ten cents and then later... But how do you conclusion, right? So in 2005 decide independently, well you know this this is a this is a mark in which the customer is really not paying much attention so you know I'll raise my price, my competitors will raise their prices. That's not illegal. I think when it happens with Verizon going to ten cents you could say hey maybe they just looked out and they saw Sprint and AT&T at ten cents so they went to ten and two and I would say if that's all that happened during that time frame you might and I may disagree. What do you mean you might? If it's just if it is just you're following up a competitor he's raising his price you've decided you know I have a choice I can leave my price low or I can raise it by a lower level and then I may get some business from him. On the other hand he may retaliate and I don't get any benefit so I may be better off if I raise my price and we'll both have a somewhat higher profits, right? I agree. I agree with that, Your Honor. There's nothing illegal about that, right? Nothing illegal about that. I don't see what the how this is different. I see it's different in that cost we're dropping during this time. That doesn't matter. Look, cost can be dropping, great, but if you think that the customers are not paying attention, right? Sleepers, they're called. You may decide well it's a small market, no one's paying attention. I'll raise my price. I'll make some more money. And then everybody else says well we have a choice. We can, as I say, try to have a price war but probably better off just, you know, follow the leader and make a little more money. I agree. There's nothing illegal about that. So let me add to that question because I really had something much the same in mind. You can look at these changes from 10 cents to 15 cents to 20 cents and they each occur over a number of months and the question I wanted to ask you is why this situation is anything different from, for example, the cereals case that the FTC had where the various manufacturers of dry cereal, breakfast cereals, had basically the same prices for their cereals. But they weren't talking to each other. The case was a bust in the end. It didn't show the kind of agreement that Section 1 of the Sherman Act, or for that matter, follow on Section 5 of the FTC Act, looks for. So what is it about this case that's that would allow a rational trier of fact to say that the moves, first to 10, then to 15, then to 20, were the result of an agreement, not the result of people just hanging back, looking at what's happening in the market and saying oh, maybe I'll try matching that too and see what happens? A couple of things, Your Honor. The first thing, I think, is the removal of the low price bundles. I don't think that you can ignore the market conditions either. During this time frame, in general, all the data, wireless data, the pricing is coming down with the cost. This is the only data product, first of all, that comes together all at one price point and then moves up three separate times. But could I say, I mean, I understood, and maybe this is wrong, your opponents to say that you had not emphasized the removal of the low price bundle before the district court. Could you comment on that? I certainly did emphasize it because I filed a brief and it was accepted by the district court prior to the summary judgment ruling. It is true that I didn't realize that it was a pretextual explanation until I was getting ready for trial. We had a summary judgment date. It was supposed to be decided before trial. We had all the trial exhibits. We also had all the witnesses set and the time set in this case was set to be tried within a two-week time period. As I got ready for trial, I realized that each of these carriers had studied this PPU texting group and they had determined that 80% of this group used less than $5. So by removing the low price bundles and setting an entry level at $5, they essentially locked that group in if they were going to continue to use text and were inelastic. But does your complaint argue that the removal of the $5 bundle, or the cheap, I guess it was $3.99, I'm sorry, bundle was done collusively? The complaint? It does not. Do you trial order anything? Do you argue that that is part of the collusion? We did argue that was part of the collusion. We filed a brief. It was accepted for filing. The defendants replied and it was accepted for filing before summary judgment and it was included in the court summary judgment order. In other words, it was included in this analysis. And we made that assertion. So it is a very important assertion that we've made. Did they need an agreement in order to do this? Why do they need an agreement? It's obvious what's going on. So they can each independently decide, yeah, we can get away with higher prices. I think that you need an agreement to do the number of things they did. The things of removing the low price bundle. The fact that Sprint moved first twice. Wait a second. Sprint moved first twice. So what? Well, they were the weakest big three of the carriers and normally the weakest isn't the first to make a price move like that. But their reason, as they say in their brief anyway, was that as the weakest, they needed the money. So they decide, well, you know, maybe it's not a huge amount of money, but we'll get a little bit more money out of the PPU sector. It's a huge gamble. And I don't think the weakest carrier, just because you're losing money, that it indicates that you should take that. None of these things necessarily on their own would demonstrate that they had an explicit agreement. I would agree with that. I don't see the together. What are the other elements that suggest to you, you know, explicit agreement? Well, we have the structure of the industry, the nature of the product. I don't understand what you mean. Wait a second. What do you mean structure of the industry? We have four carriers that control 90% of the market. Three that control 80% of the market. Yeah, well, what is that? That makes it easier to have tacit collusion. Well, tacit collusion, the Supreme Court says, is equal to conscious parallelism, which is not unlawful. But I think a tacit agreement, as in Twombly still says, Come on, look, the point is, if you have only four companies dominating the firm, that's where you have, of course, tacit collusion. If you have a hundred firms, it's not going to work, because you can't keep track of everybody. There'll be too much cheating. So this looks perfect for tacit collusion. How can you use a small number of firms as an argument against tacit collusion? I'm not arguing that it's against it. You're completely wrong.  Well, it's what you just said. You said it's one of these factors that can support an inference of explicit collusion if there are only four markets with 90% of the market between them. It's the opposite. That's what facilitates tacit collusion. Concentration. I said it indicated a tacit agreement. I don't disagree with that. What's a tacit agreement? There's no such thing as a tacit agreement. There's an agreement, or there's tacit collusion, where I know what you're likely to do, so I'm going to do it. That's tacit. Now, what do you mean by a tacit agreement? Twombly says you can have a tacit or explicit agreement. You have to show us what evidence in the record takes this from, I'll use a different word, the conscious parallelism scenario, which is certainly one we've seen many times when you have very small numbers of players in the market, over to an agreement that can be proven by circumstantial evidence. Agreements can be winks and nods if everybody is saying they don't have to utter the words, I hereby agree, and we understand that. But you need to show us, again, the evidence in the record that would allow a rational trier of fact to say that these three price moves, or any one of the price moves, you don't need all three of them, resulted from an agreement to go to a certain point, as opposed to savvy companies just reading the Wall Street Journal or the trade press or whatever and saying, well, Sprint's trying 15 cents, maybe we'll give it a whirl too. The carrier's explanation was they wanted to make money and they wanted to drive people or encourage people into bundles. The studies they did internally, as to this group, showed that those people did not go into bundles. Each of them studied and made a study of that. Both AT&T and Verizon found that around 2% would move into bundles, and for those people that moved into bundles, they took a loss. T-Mobile determined that nobody, there was no uptake in bundles. And finally, Sprint said it was indeterminable of whether this encouraged people into bundles. That explanation given to Congress, DOJ, and to the district court down below is pretextual. That's a lie. What does that have to do with the agreement, though? Well, if you lie about the reason you did something, you can infer that there's an agreement. I don't understand you. I don't understand you. In a tacit collusion, a conscious problem, suppose I raise my price. And why do I do it? Because I'm a pig and I want to make money. But if I'm called by Congress and they say, you're gouging the consumer, I'm not going to say I'm gouging the consumer because I'm a pig, right? You say, well, you know, very valuable product. I have a lot of expenses. I have to do it. I don't want to do it, but I have to do it, right? So why is lying any evidence of an agreement? Well, the case is, say, JTC says that a potential Well, just tell me what sense that makes. Because just like they didn't want to tell It doesn't make any sense. They're always going to lie in the sense of making their motives seem less greedy, right? That's true. And when we catch them in that lie, it shows that maybe they had different No, it doesn't show anything. It just shows that businessmen are not candid for obvious reasons. I understand, Your Honor. Let's take it, then, the direct evidence. The herdage, Roddy, e-mail that says it's collusive and opportunistic. Look, first of all, this fellow herdage can't spell collusive, which suggests he's not a real expert, you know, on antitrust law. And the other thing is, all he says is, I know the other guys are doing it, but that doesn't mean we have to follow. That is entirely consistent with tacit collusion. For all we know, when he uses the word collusive, he's talking about tacit collusion. We could do what the other guys are doing. That would be tacit collusion. But we don't have to. He, for some reason, thinks they'd be better His company would be better off if they didn't do that. I don't see how that's an acknowledgment of explicit collusion. Well, he was in charge of pricing when they did the first He has his own views. He thinks his company should not go along with this tacit collusion. I don't see anything where he's suggesting that there's an agreement and we've been asked to join and I don't think we should join. Well, then he says, make sure you delete this email. Yeah, because look, he's insulting his bosses, right? He doesn't want an email like this. He's a junior guy and he's insulting his bosses. He doesn't want an email like that floating around. He's not that junior. At the time he writes this email, he's a vice president. He's not the boss and he's insulting the bosses, right? He certainly is insulting. Well, you don't want to insult your bosses in an email that they're going to see, right? Well, then he deliberately just, you know, deletes it. Sure, he's deliberately protecting his rear end, right? That isn't a violation of the antitrust laws. Well, his own rear end and his boss's rear end and he deletes it and so Yeah, exactly. That has nothing to do with collusion. Your Honor, I understand what you're saying. I think that in a market where costs are falling and the analysis that each carrier did, not a one examined the business case of going No, look, costs are falling, but suppose demand is increasing, right? Well Then you'd see an operator, demand is becoming, I guess they thought demand is becoming less elastic. So they can hold on to these people, this marginal group, even though they're raising their price. That has nothing to do with violating antitrust law. Certainly, if that's all that was going on, but they determined that this group, they made them more inelastic by removing that low price bundle. While saying they were encouraging this group to get into bundles, they took away the viable bundle for them to get into. That's not okay to make it more inelastic that way. No, no, that's okay. It's not very nice. But if each of them does it without agreeing to do it, then there's no violation of the antitrust law. If you take a look at the analysis that each company did internally as to each of these moves, not once, not any of these ten moves, did a single company analyze what the other companies would do, okay? Well, I think what you're trying to argue, and I'm not sure that there are facts here, but if you could show that these price moves are not profitable unless done by all four companies, then you're starting to move toward the direction where you could find a cartel. But I think what we're looking for is that kind of evidence. This is a very small group of consumers. I imagine them being somebody's grandfather who hopes that maybe his grandson will send him a text one day, and he doesn't really use texting too much on his own, unlike the kids who do nothing but text day and night. But you need that evidence that it wouldn't be profitable unless, and here you have all sorts of facts about the market, including the long-term contracts. People don't move in and out, and if you're only spending $4.50 a month on your texts, the demand is inelastic. There's tons of evidence in the record showing that this PPU group were quite inelastic in their demand. They're not selling fruit for money. When they did the studies about what happened after, it didn't show that inelasticity that Your Honor just referred to, and Your Honor asked for evidence of that. If you take a look, and it's in the reply brief, and it talks about what happened when Sprint made that move first. First when T-Mobile moved to Tencent, you had a 25% decrease in use. When Sprint made that move before AT&T, then called Singular, matched them, it was catastrophic. In their own words, they had a 100% increase to calls, which is tens of millions of dollars. They had a 10% decline in usage. They had a 5%, 4.5% to be exact, people just quit using. It was a huge hit that they were suffering, and the VP said we're going to have to move back down quick. On a unilateral basis, it wasn't going to work. We have evidence of that, and we have evidence of that at every move, that they weren't so, quote, inelastic as they say. Sprint suffered that. AT&T documented that they also had a 10% decline in use, and a 5% decline in that. Only a 2.5% to bundles, and they took a hit on that. In other words, if the other companies hadn't joined, and joined rather quickly. Well, joined is not quite the right, if the other companies hadn't followed suit. I don't know how you're distinguishing between doing what the other companies are doing, and agreeing with another company to do something. And I think you have to. There doesn't seem to be any evidence of agreement. I think that you don't have two things. Your Honor cited in your book, you cited the drywall case, where two things happened at the same time. The prices were rising, and they stabilized those prices, and the next thing they did is they removed all the discounts. That's what we have here with the bundles. And when the companies don't join, and until the companies do all join up, they are hemorrhaging. So it makes sense that you would analyze that, especially after the first move. Let's say after the $0.10 to $0.15 move, and you get the data back. Then Sprint makes the move again on their own. They don't make that move, seeing what happened before, unless they know the other companies are going to join. So what weight are you placing, if any, on this April 10, 2010 email that the AT&T guy sent to the president of CTIA? He says, there's also this, there's sort of an unwritten rule that we all try not to surprise each other. If any of us are about to do something major, we all tend to give the group a heads up, keeps everyone honest, and builds trust, plus we all learn valuable information from each other. If you take a look at the evidence of CTIA, that email, the other co-option email, and that they are actually in business with their association in text, the common short code. They're actually in business, 50% of CTIA's revenue comes from a business that they're in with the carriers. Dealing with text, common short code of voting for American Idol or Major League Baseball. Yeah, text to 1-2-3-4-5. Text to 1-2-3-4-5, and it also impacts PPU text as well as bundled text. That's how this association gets its revenue. All the cases that talk about associations as walking conspiracies, they don't have anything like being in business with your own association to expand the product that's at issue here, and that's what we have here. There's a huge benefit to having a system that works for everybody, that's interoperable across platforms. Terrific, and in 2002, when they made it interoperable, it exploded. There's a huge benefit in that, and for three years, though, they kept prices very diverse, and they were different across the board. Within three years, they all come together. The experts on the other side say, that explains why we have these price rises. We have an inelastic group, we can raise the prices, we can squeeze it. It may not be that nice, we may be pigs, but we can do it because we can get away with it. Sure, but that's not describing an agreement. That doesn't explain why the next three years, just from an economic standpoint, it rises again, demand continues to rise to 2011. We should see more piggish activity if they say that that's the reason that they're doing it. No, they had an agreement during these three years to raise it to 10, they consolidated to 10, got rid of the low-priced bundles, went to 15 and 20. All the while, internally, the vice presidents that are analyzing are going against the moves. Here's what happens. The sprint analyst internally that would analyze it and send it up and come down, that's not the way it happens, okay? But wait a minute, I mean, internally, companies do things all sorts of ways, and somebody at the top has to make a decision. Is it your theory that it was the letter from Senator Kohl and the Wall Street Journal coverage that brought an end to this agreement? No, the agreement continued on. The agreement, the pricing... You said it lasted for three years, so I thought your theory was that it came to an end. The price crisis took place in a period of three years, but demand continued on. So I think the conspiracy... But most of the demand is not in the PPU, tiny little sliver of the market. Well, that tiny little sliver of the market is about, let's say at AT&T, remained about 10 million people. At every place, even though it moved down to about 1% or 2% for AT&T and Verizon, it remained a significant revenue driver, almost up to 10%, with such a small, quote, sliver. So we're talking about, it may be not much, they say, to Verizon and AT&T, but it's billions of dollars. And I'll tell you, it hit this group the very hardest. They said, oh, it wasn't that much of an increase on their bill. As that congressional investigation showed, and Your Honor made a mention of, who is it? That's right, it's usually older people on a fixed income. It's not okay to charge another 74 cents or $1.25, because you can, as to this group, and discriminate. But somebody should have taken advantage of that, and somebody should have taken advantage and competed against it. And we don't have a single piece of evidence. These analyses, they stopped going through the normal course. They started being dictated from the top before the analysis went up and came back down with the decision makers. They happened within a week, over the weekend, and at T-Mobile, they happened before the business case had ever been developed. And after the CEO, Dotson, of T-Mobile, had a call with Verizon's McAdams about Spectrum, it was only after that call, and we have notes of that, only after that call did he approve it, and then they asked the business case to be done. These circumstantial evidence support that, in fact, when Roddy and Herditch talked about collusion, they knew what they were talking about. And, in fact, Herditch testified about what he thought. Look, it's not at all clear that Herditch is talking about explicit collusion as opposed to tacit. I don't think that you have to. I believe that you don't need to actually communicate with the other side to reach an agreement. I believe they coordinated these moves and reached an agreement that had burdensome benefits. Well, wait a second. How do you distinguish between this tacit agreement and simply looking at what your competitors are doing and deciding to do the same thing? Because T-Mobile gave up their market niche in the youth market to do this. And, in fact, over time, in fact, it just brings up another, in fact, over time, Sprint and T-Mobile suffered market losses in both percentage-wise, not a lot, but they suffered as far as revenue and as far as number of subscribers over time after making these three moves. In other words, their market shifted down a little, and AT&T's went up overall. And I think those indications show these were not in their best interest, but there was more going on. Was it Spectrum? You're right. You've lost me. They're doing things that aren't in their best interest? Well, T-Mobile certainly made a move that was not... Well, why are they... what's their motive? Their motive was twofold. One, super competitive profits. And two, there must have been... Well, they're not acting against their interests if they're increasing their profits. If it's short-term, they certainly are. Well, wait a second. They know what their interests are. Right. Don't they? Are you saying that this agreement was hurting them? No. I'm saying that in probably the long term, the agreement may not have been in their unilateral best interest unless there was more going on. Because they ended up losing a little part of their market share. And they talked about it at the time, how it actually may hurt them. I just want one small factual clarification. Heritage, at the time of the email, did you say he was in charge of pricing at T-Mobile? At the time that he wrote that email, he was back in charge at a higher position in data, strategic pricing. He was a vice president at the time he actually wrote the email. And he was involved and stayed involved in all three moves. He was back from prepaid where he had been for two moves. And his job description throughout that period was to counsel and advise Roddy during that time period. And she viewed herself as a facilitator. I'll reserve my time. Thank you, Your Honor. Thank you, Mr. Coughlin. Mr. Panner. Thank you, Chief Judge Wood. And may it please the Court, Aaron Panner for the appellees. The district court properly granted summary judgment because after extensive discovery, there were millions of pages of documents produced, there were dozens of depositions taken, and there were multiple expert reports produced. There was no evidence that tended to exclude the possibility that the defendants acted unilaterally and not pursuant to unlawful agreement as Matsushita requires. So maybe you can answer this question for me then. You know, I asked on one side of it to Mr. Coughlin, which is why, when we look at this, for example, this chart he has on page five of the reply brief, why we wouldn't see something that looks like the serials case, you know, just everybody looking around saying, oh, okay, 10 cents is out there, let's try 10 cents, and so on. But my question for you is what are we to make of the uniformity of the price? Why not 11 cents? Why not 16 or 14? Even serials had slightly different prices. Yes, Your Honor. There was actually testimony about this, which was that before Sprint moved, some of the carriers had considered the possibility of moving to 12 cents. Correct. And then when Sprint moved, the carriers saw what was going on in the marketplace. And there was testimony both from Verizon, and there were contemporaneous documents at Verizon, there were contemporaneous documents at AT&T that showed that there was no negative marketplace reaction to the increase to 15 cents. And so the carriers looked at this and saw that there was market tolerance for the change, and they did match it. No, I understand that. But what I'm trying to put together several pieces of your theory. A big piece of your theory is the reason the market absorbs this rather considerable increase from 2005 to 2008 is that demand for this particular kind of service is quite inelastic. Well, if it's really all that inelastic, then I don't see why you would, you know, when somebody gets away with 15 cents, say, well, maybe we can squeeze a little bit more revenue out of it at 16. Or maybe if you're T-Mobile, you say, well, we'll go up to 14 because we'd like the money, but we can still say that we're the lower price service provider. Well, Your Honor, there is extensive evidence about what the carriers discussed at the time they were contemplating these moves and what did occur. First of all, the 10-cent price point was in the market. That was not alleged to be something that was the product of collusion. Sprint and AT&T, then Singular, charged 10 cents before any supposed conspiracy began. Verizon then matched that price point, and their discussions about that essentially said, look, this price is out there in the market. It looks like something that we ought to do because it would be profitable. But why nobody thinks at any point along this curve that going a penny up or a penny down is worth it. I mean, the uniformity is something that bothers me. I can certainly see people over this number of months watching the market to see what reactions are. That happens in oligopolistic markets. It happens in markets where tacit coordination is taking place. But identity is troublesome, especially against the backdrop of many opportunities for the high-level executives to discuss these things in the email I mentioned earlier. Your Honor, I don't think there's anything paradoxical about the fact that the carriers chose to match price points that had already been out in the market and to which the market showed acceptance. And that's exactly what the internal documents show. How important is it that the market does show acceptance? Mr. Coughlin said that, in fact, there were negative responses in the market to some of these moves. Is that a disputed issue of fact? I don't think it's certainly not a material issue, Your Honor. What the record shows is- Because by what Your Honor means is market resistance that would suggest to another carrier that there was a possibility that the move would not be profitable. There was no such evidence. And there's nothing like that. Remember, the carriers are looking very carefully and they can see, are we seeing an influx of customers, for example, from Sprint? But you'd never see an influx of customers the way this market is structured because everybody's captured in these two-year contracts. Not at all, Your Honor. There's a low rate of change. Your Honor, it is not a low rate of change. The average churn in the market at this point is somewhere around 30% a year. So that means that 30% of customers are changing over every year, and of course it's on the margin. So customers are coming off their contracts all the time. What was the percentage of people who used PPU at this time? It's not an insubstantial number of customers who will use- What's the percentage, say, of AT&T's customers who were using PPU? At the time, the number is in the record, Your Honor. It's not as much as 10%, I don't think. No, it would be more, Your Honor. It would be more, and the reason why is because a PPU user is anybody who sends a text message who doesn't have a plan. So for the vast majority of those, they're sending a very small number of text messages, but in the example that you talked about where a family member who doesn't ordinarily text would receive a text message from another family member, that would be PPU usage, even though the person isn't using it necessarily on a regular basis. Do you think it would be as much as 30% of customers? Yes, Your Honor, I think at some points it was in that range. 30% of 30%? 30% churn, 30% of that is the number of people who would be affected. Well, let me try to back up to clarify the point, which is that the carriers, at the time that they are anticipating the potential change, try to determine what are the risks if we do this, what are the risks that we will lose customers as a result. And where's the evidence in the record they're talking about that? Mr. Coughlin says that there's very little competitive analysis in the documents that were generated. Well, T-Mobile expressly modeled incremental churn into their financial model. In the case of T-Mobile, the concern was actually not around having a negative reaction to the price increase. It was that there would be an opening of the contract. Your Honor referred to the early termination fees. It's another part of the answer to something Your Honor was asking about before. T-Mobile had some concern that some customers, seeing that they now have the opportunity to leave, will leave not because of the price increase but because of the opportunity. Sprint had the same concern, and they actually took steps. I don't understand how that, they have the opportunity to leave anyway, regardless of. I wasn't clear. The contracts have, as you noted, their early termination fees if they haven't expired. In some cases, some of the carriers had the view that the increase in the PPU rate was a material change that therefore opened the contract. So that opened up a window for- Exactly, Your Honor. And in fact, Sprint anticipated that, and Sprint had a policy whereby if customers called and complained and said, I'm going to terminate because you've raised my price, they would roll it back. That was one of the things they did to protect against the possibility that there might be churn. Now, Mr. Coughlin referred to a document from Sprint. It's in the Plaintiff's Sealed Supplemental Appendix at 56. Can I make a parenthetical comment? It's really not for you. Yes, Your Honor. It's for the others. I found the deletions mystifying, actually. I looked very carefully at every single one of them, and aside from one or two mentions of money that it seems to me are elsewhere in the record, I couldn't figure out what this sealing is all about. Your Honor, I think that in the circumstances, most of the record is not sealed. Right. There were a few documents that remained sealed, and I believe it was because of the method of analysis and there was concern that that would be competitively sensitive. I believe that that's the reason that some of that was maintained under seal. Okay. The- So, I mean, like on page 35 of the ply brief, there's a sentence that just says, while Heritage later praised a follow-up analysis. That was deleted. I mean, I- It was sealed. I just don't know why. I can't speak to the specific examples, Your Honor. I'm sorry. But I can say that getting to that document, the sprint document to which Mr. Coughlin referred, he called the price increase, I think he used the word, catastrophic. And if you actually look at the document, the first line is, increased pricing has raised casual messaging monthly revenue by 50% as expected. So it was not at all catastrophic. There were concerns that it might lead to a negative reaction in the future. This was written by- Now, let me just clear up one thing about your position. Certainly. In your brief, I got the impression, maybe this was wrong, I hope so, that you were saying, well, this is just one part of the overall package of things being sold, and so it's not important enough to fix prices over. And that, if that's what you were saying, strikes me as wrong as a matter of law, since cases like Catalano and others make it clear that even if it's just one aspect, it's covered. Absolutely was not arguing that that would be lawful, Your Honor. Not at all. The point that we were making was that in thinking about whether this is a plausible theory, one of the key points that was brought out below was that this is a small part of a bundle of services. But that's where your position is contradictory, because on the one hand, you're saying, oh, this is great, we're getting all this extra money, which makes it seem not trivial enough to fail to drive some sort of collusive decision making. And on the other hand, you're saying, ah, this is just, you know, the tail that's out there, and who would go out of their way to do something with that. And I will immediately get to your question, Your Honor, because I really enjoy talking about it, to be honest. But let me just point out up front that whether there's a dispute about that and the economic analysis over, you know, whether this was fully plausible as tacit collusion or not, or tacit coordination, I guess I would say, or not, the key point is that what the district court saw was an enormous record of unilateral, independent decision making by each of the carriers. And what the district court reasoned was that the only way that you could put together an evidentiary record like this is if you had some vast, multifaceted conspiracy. He said it very well in his opinion. Temkin Village and so on, I understand that. But I guess, you know, that's what we're here to see, whether there is evidence that tends to exclude the possibility of independent action. And I asked that question to Mr. Coughlin. I'm concerned about it here as well. And one of the potentials is the fact that the price increases were all identical over a relatively short period of time. Well, Your Honor. There may be something else, or there may be, as you argue, nothing else. Well, Your Honor, I think that the question that you were asking was about why it would, why on the one hand there was additional revenue to be had, and on the other it's a relatively minor part of the service. I think, and the expert reports by Professor Murphy address this in detail. In a situation like this where there's a very competitive market, all the experts agreed it was a very competitive market. There is a, and the service that's being sold is sold in a bundle of different services. But not this part. No, this is, to be clear, this is sold as part of a bundle of service. You don't buy PPU text messaging on its own. You buy it. But that bundling in the sense that you're talking about bundling, you get 250 text messages for five bucks. Correct. It's not a texting plan. Text, phone, data. Exactly. I'm sorry to interrupt you, Your Honor. No, no, that's exactly right. I just want to make sure we're talking about the same thing. Exactly. So there's a tremendous incentive on the part of the carriers to try to come up with a pricing structure that will allow them to recover their margins where they can. And I think that Judge Posner was asking during Appellant's argument, you know, this is something where customers who are buying these by ones and twos may not be paying very much attention. More concretely, the impact on the bill of an increase of five cents may be for most of, for the vast majority of these, is small. It's less than a dollar for the vast majority of the customers who are purchasing this service. So there's a significant advantage to a carrier by doing that. Because of your inelastic demand argument. They don't care if they're paying 15 cents or 20 cents if they're only getting one text a month. Right. And the key point is, Your Honor, that as long as that does not lead to customer losses, you'd rather your competitor not do it. Because you're getting an advantage. You have this additional revenue. You can then cut your prices elsewhere. And that was really the... We didn't do that. Well, you do see that. That's exactly what you see, Your Honor. For example, when Verizon increased their per message rate to 15 cents, at the very same time they greatly expand the size of the texting bundles. This is just the price for, the cost, I should say, for texting is just plummeting. Well, the cost isn't plummeting, Your Honor. The cost is very small to begin with, and it remains quite small. But the price of texting service is going down quite dramatically because customers are moving to bundles. I should call them plans to avoid the confusion I had before. Customers are moving to the texting plans. And so their usage is exploding. The price is going down very sharply. And the customers that remain in the PPU area who are purchasing the text messaging on a PPU basis are increasingly inelastic. And that, again, that's reflected by the analysis that's going on. It's not... Each of these moves is not mysterious. But if they're so inelastic, why do you stop at 20 cents? I mean, why does everybody stop at 20 cents? If they really are inelastic, you could go to a quarter. Well, Your Honor, I think that there isn't anything in the record that specifically addresses that question. But I think it's quite possible that the reason is that this particular price had gotten a lot of attention. And, for example, there's in the Heritage email, which is obviously not our favorite document in the case, he does say, look, we might get regulated. And so it's not unusual that they might make a decision that this is something that's gotten a lot of attention. We don't want to wind up in the Wall Street Journal. But the other possibility is, and there was testimony to this effect, that, in fact, the dramatic change in the pattern of consumption and demand stopped. That 2005 to 2008 is really the watershed period where the usage of text messaging explodes. And then after 2008, it continues to increase for a time, but it does not increase at anything like the rate that it does before. And so there was testimony by Professor Murphy that it may well have been the change in that dynamic that led to the leveling of the PPU price. That strikes me as possible but contestable. Again, Your Honor, that may be. But I think that what the district court was so moved by was this extraordinary evidence of how the carriers looked at this problem and how they made the decisions that they made. There really is not a situation where you have, all of a sudden out of the clear blue sky, price increases that are simultaneous or closely coordinated by competitors in a circumstance where there's really no explanation for it. None of those things are true. How simultaneous do you think it would need to be? Like the same week? Well, I don't think it's a question of how many weeks, Your Honor. You're saying it's not enough here, but I'm saying, so in your view, the number of months that elapse as everybody moves up to 10 and then 15 and then 20 is too long. So what's the right amount of time? I think, Your Honor, that the district court got this exactly right. What he said was, I don't know how long it has to be, but I look at the record here and I can see that, in fact, there was sufficient time between these moves for the carriers to say, huh, I've seen a move in the market. This might be a good idea for me. I'm going to analyze it, figure out if the financial analysis suggests that it would be advantageous. And if it is, make a recommendation. And that's exactly what happened. So it's not a question of whether it's two months or four months, but it's a question of when you look at the evidence, because we're not dealing anymore with the question of what's alleged. We're looking at what the evidence shows. And you're also looking, I guess, you have to postulate that there is, in fact, no understanding among the companies. I'll try to use that word. An understanding, an agreement is a lot, but you know all these hypotheticals about what's enough to make an agreement. But when they're sitting there after their CTIA meeting is over, they aren't saying, okay, you know, when we decide to go to 15, we'll give you a heads-up so that you can decide if you want to follow us, you know, or something like that. There's this heads-up memo that works. Your Honor, with respect to the April 10, 2010, email from the AT&T executive to the president of CTIA. Yes, Your Honor. There was no testimony taken about that, even though the recipient or the sender of the top email was deposed. But I can tell you that what's going on here is a discussion about public advocacy efforts. The individuals who are involved are people who work on public advocacy. They're not individuals who are involved in pricing or business decisions. So that may be, but do you have to read it that way? He says, we all tend to give the group a heads-up, plus we all learn valuable information from each other. Isn't that an ambiguous statement? Your Honor, in the circumstances, it all, again, the plaintiffs have not done anything to show what that document means or to suggest that it is in any way an indication of anything that relates even to competitive activity. Had they taken that discovery, they would have found out that it does not. It relates to public advocacy efforts. But the point is that at this point, their burden is to introduce evidence that tends to exclude the possibility that the defendants were acting unilaterally. And the key point here is that the district court was confronted with a record that was tremendously detailed with regard to how the defendants were making these decisions, what was going on. This is, again, not something where there's a black box or all of a sudden there's price changes, they're closely coordinated, and it's a sort of catch-me-if-you-can. What's going on here is that there is a very well-documented course of decision-making that leaves no mystery as to why these changes were made. They were expected to be profitable and in the interest of the companies, and they were proven to be so. It's hard for me to imagine that anybody in any of the companies in this big record would have written an email or a memo saying, let's raise our price to $0.15 because we agreed with T-Mobile and Verizon and Sprint that we'd do so. You don't see memos like that. Well, Your Honor, I think that, again, it goes to the Potemkin Village point. The issue is that what occurred, and Sprint's move to $0.15 is actually a terrific example. Sprint is in a situation where they have a significant revenue shortfall compared to budget, and they look at a wide variety of moves that would tend to make up some of that revenue. Mr. Coughlin said no data prices went up. That's not true. Sprint looked at an increase in casual data and, in fact, adopted it. And so there's concern about it, and of course there is. Businesses are making decisions. They're risky. It could backfire. Someone could scream about it in a way that might not be captured by the financial analysis that goes before. And, of course, there's disagreement about whether the course is the right one to pursue. But the point is that what the record does not show is any situation where someone said, look, we're doing this. I don't care what the analysis shows. Let's just move ahead. Because, instead, what's going on is there is an ordinary course series of decisions where, based on prior experience, based on the analysis that they do, based on the data that they have, these moves are seen to be advantageous and a possibility for gaining revenue without losing customers. Unless the Court has further questions. I'm concerned about the spoliation ruling here. It seems to me that the judge, in effect, said, well, you have to show me what was destroyed before I'll take the adverse inference. Am I reading that wrong? I don't think that's what the Court was saying, Your Honor. I think what the Court was saying is there needs to be you need to provide a basis for me to find that the document was destroyed for the purpose of concealing adverse evidence. And I have looked at what Hurditch's role was with respect to this increase to 20 cents, which was he sent one email criticizing it, but he was not involved in the analysis or responsible for it. He was in a different business at the time. I don't see any claim that he knew about any collusive conduct. I don't see any evidence that he ever had contact with competitors or anything like that. And therefore, I don't have any basis. I don't think that he didn't see any basis for saying that what was destroyed had evidence that was adverse to T-Mobile as opposed to being an embarrassing critique of his bosses. And what about the Roddy notebooks? With respect to the Roddy notebooks, as the District Court found, there was simply all that was suggested was that they had been misplaced. Some of them were recovered, some of them were not, but there was no indication that they were in any way deliberately misplaced. So that's unlike the situation. It might be a little bit more akin to the, I think it's the Bracey case that this Court recently decided, where there's documentation that's accidentally destroyed without any knowledge of what's in there. In the case of the Roddy notebooks, again, the Court didn't get to the first step of finding that there had been a deliberate destruction of any potentially relevant evidence. In the case of the Herditch email, by contrast, there was a suggestion that this had been deliberately deleted. But that's not the case with the Roddy notebooks, where what the Court found was, and again, he would only be reviewed for clear error, what he found based on the record was that they had been mislaid without any deliberate intent to do so. It was just, in a vast case like this, documents can sometimes go astray. All right, thank you. Thank you very much, Your Honors. All right, thank you very much. Mr. Coughlin. Thank you, Your Honor. As to the spoliation in the Herditch Roddy email, the Court found it was done deliberately and that litigation was imminent. So at that point, I think the District Court did want us to show that what was deleted, and so we have bad faith deletion here because it was in violation of their own policy, done deliberately, and litigation was imminent. Those are the findings. We should get the bad faith ruling. We shouldn't have to show what was in that. We can only imagine what was deleted if what was saved, and in fact, he deleted everything. You're right, Your Honor. He wanted to get rid of everything. It was Roddy who didn't delete the last email because that's who it was produced from, about it's collusive and opportunistic. She didn't respond, hey, are you accusing the company of being in a conspiracy here? And maybe he didn't know how to spell collusion. He had gone to Berkeley to get a master's in economics, and maybe he was just doing it fast, but he testified that he knew what collusion was, and he testified the email was ---- You don't know what collusion is because you don't distinguish between tacit and express collusion. Oh, I certainly do, Your Honor. I think that you can have a tacit agreement here. There doesn't have to be communication, and I think that we have that. I strongly advise you at least to pay attention to the vocabulary that Judge Posner is using. There has to be an agreement. The agreement can be proven in a number of ways. People can make hand signals. They can do it in Braille. They can send emails to each other. They don't have to sit down and sign a piece of paper that says agreement on the top, but there has to be an agreement. If it's just everybody watching everybody else and deciding each on their own to move in the same way, there's no agreement, and it's tacit. That's right, and that's what I mean, and I'll quit using the term. That's what I mean by tacit agreement. There has to be an agreement. There has to be an agreement. We agree with that. There has to be an agreement. It can't just be four gas stations watching somebody raise ---- But Hurdage didn't say there was an agreement. No, I think that, with all due respect, that's your interpretation. What Hurdage said, it was collusive and opportunistic, and it was in reference to all three moves because that's what the article that came out in the Wall Street Journal was. That's what he said about these moves, and he was in a position to know. Do you think opportunistic implies agreement? No, I don't. I think it could imply ---- So why do you mention opportunistic as somehow helping your case? Of course they're opportunistic. They see an opportunity to make more money. But he used the word collusive, which the ---- Which we know is ambiguous because it can be expressed or it can be tacit. Well, that's true. That's true, but I think that the dictionary says that collusion is when people get together and agree. That's the Black's Law Dictionary. You're using it in a term that certainly ---- I mean, the law has made the distinction between the tacit and express collusion, right? That's true. Tacit collusion is not actionable under anti-social. That's correct, conscious parallelism. I think that we have an agreement here. What's the evidence of the agreement? Well, I think it's not only the statement, which I think you can interpret this way. But the statement is ambivalent, ambiguous. As Your Honor would say, even if it is ambiguous, even if the court found it was ambiguous, it would still be considered in the mix of everything else. They didn't once consider ---- I wish I knew what the everything else was. I think the everything else was that they did these analysis at every move, and they never considered another competitor not following or themselves competing at that level. I don't think that ---- I think that shows that they knew they had an agreement. They were asked to do an analysis, essentially a lift analysis. That's what they did. Then they took away the low-priced bundles and supplied a pretextual explanation. I think when you add up all of those things in this market as cost of following ---- What do you mean by pretextual explanation? They said they did it because they didn't want to be called pigs to Congress. They did it to move these people into bundles. Why is that pretextual? Because they are subject to regulation, right? No, they knew that these ---- So they didn't have to worry about that? Well, they are not subject to regulation as they might have been in Canada. What they did was they said they were trying to move this group into bundles, and that was not true because they had studied that, and that's not what this group did. In fact, that document, that sprint document shows that customers on page 14 of the reply, that it did get a rise in revenue. Ten percent of the customers were shocked. Calls to care increased 100 percent. There was a drop in the usage and the number of customers. So it wasn't inelastic, and the hemorrhaging stopped when Singular and AT&T joined. They needed somebody else to join them to stop that. And so that's what I mean about all of the other things that come together. And so I don't think that ---- We never called these analysis shams. In fact, what they were, we called them shams if they were done to justify competitive moves. They weren't shams in and of themselves. They were exactly what you would expect if you were asked to analyze what the profit we would make with everybody, essentially, because they never analyzed what if somebody else didn't move. And that rise in this use kept going to 2011, so you would expect the rise in prices to continue on there. I think it's time for you to wrap up. Thank you. Your Honor, I'd ask about the early termination fees. A number of the carriers basically didn't have the waiver, as T-Mobile did. Another explanation why they always went last while everybody else got in place, because their customers could move because they did find it was a material change, as did T-Mobile. Thank you. All right, thank you very much. Thanks to all counsel. We'll take the case under advisement. Thank you.